725 F.2d 47
 DETROIT, TOLEDO AND IRONTON RAILROAD COMPANY (82-3251),
Soo Line Railroad Company (82-3363),
Minneapolis, Northfield and Southern Railway, Inc. (82-3364),
The Kansas City Southern Railway Company (82-3385), Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents.
 Nos. 82-3251, 82-3363, 82-3364 and 82-3385.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 27, 1982.
Decided Jan. 12, 1984.
 
 Earl C. Opperthauser, John C. Danielson, argued, Detroit, Mich., for Detroit, Toledo & Ironton R. Co.
 C. Harold Peterson, Minneapolis, Minn., for Soo Line R. Co.
 David M. Schwartz, Sullivan & Worcester, Washington, D.C., Robert K. Dreiling, Kansas City, Mo., for Kansas City Southern R. Co.
 Robert N. Kharasch, argued, Edward Greenberg, Olga Biokess, Rhonda Migdail, Galland, Kharasch, Calkins & Morse, Washington, D.C., for petitioners in Nos. 83-3363, 82-3364 and 82-3385.
 Richard A. Allen, Lawrence H. Richmond, argued, Washington, D.C., John J. Powers, III, Kenneth P. Kolson, Dept. of Justice, Washington, D.C., for respondents.
 
 
 1
 Harold E. Mesirow, Lillick, McHose & Charles, Washington, D.C., for Atty. Gen. of British Columbia, The Foss Launch & Tug Co.
 
 
 2
 Gordon P. MacDougall, Washington, D.C., for Patrick W. Simmons.
 
 
 3
 Daniel S. Kuntz, Asst. Atty. Gen., N.D. Public Service Com'n, Bismarck, N.D., for N.D. Public Service Com'n.
 
 
 4
 Richard A. Hollander, Richmond, Va., for Family Lines Rail System & Chessie System R.R.
 
 
 5
 Eugene T. Liipfert, Washington, D.C., for Florida East Coast R. Co.
 
 
 6
 Donald E. Engle, Burlington Northern R. Co., St. Paul, Minn., for Burlington Northern R. Co.
 
 
 7
 Louis P. Warchot, argued, San Francisco, Cal., for Southern Pacific Transp. Co., St. Louis & Southwestern R.R.
 
 
 8
 Before LIVELY, Chief Judge, and KENNEDY and MARTIN, Circuit Judges.
 
 
 9
 BOYCE F. MARTIN, Jr., Circuit Judge.
 
 
 10
 Petitioners seek review of an Interstate Commerce Commission decision removing certain protective conditions imposed on railroad mergers by the Commission during the past sixty years. We have jurisdiction to hear this case pursuant to 28 U.S.C. Sec. 2342.
 
 
 11
 An understanding of this case requires some knowledge about the railroad merger process. Railroads wishing to consolidate must obtain permission from the Interstate Commerce Commission. 49 U.S.C. Sec. 11343(a) (1983). The Commission must approve their merger request if it finds the merger to be in the public interest. 49 U.S.C. Sec. 11344(c). There are certain factors which the Commission is required to consider in making its public interest determination. 49 U.S.C. Sec. 11344(b). Finally, the Commission may impose whatever conditions it considers appropriate on the merger. 49 U.S.C. Sec. 11344(c).
 
 
 12
 Over the years, the Commission has frequently imposed conditions on mergers to guard against potential anticompetitive effects. For example, before a merger, there is one railroad, X, carrying goods between points A and B, and two railroads, Y and Z, carrying goods between points B and C. After the merger, there is now one railroad, XY, stretching all the way from point A to point C, and one line, Z, still operating only between B and C. In this new competitive environment, and absent any restrictions, the new railroad, XY, might insist that all shippers send their goods on its single-line haul from point C to A and not on the joint-line haul using railroad Z from C to B and then railroad XY from B to A. Railroad Z would then be forced out of its old market.
 
 
 13
 To avoid this result, the Commission has traditionally imposed conditions on mergers which essentially require consolidated railroads to continue the same relationships with the other railroads as existed before the merger. First imposed in 1922, these conditions were finally distilled to a set of six standard conditions in a 1950 consolidation case, Detroit, Toledo & Ironton R. Co. Control, 275 I.C.C. 455, 492.[1] Since 1950, these so-called "DT & I conditions" have been imposed on most mergers, sometimes combined with special conditions to deal with unique or difficult situations.
 
 
 14
 The Commission has interpreted the DT & I conditions to require, among other things, "rate equalization." This means that consolidated carriers must refrain from charging rates on their new, single-line routes that are any lower than the rates on competing joint-line routes in which they also participate. To allow otherwise, in the Commission's view, would result in the "commercial closing" of the joint-line routes and a decrease in inter-railroad competition because shippers would automatically send their products on the cheaper route. See Rulemaking Concerning Traffic Protective Conditions in Railroad Consolidation Proceedings, 366 I.C.C. 112, 113 (1982).
 
 
 15
 In recent years, however, the Commission has become increasingly reluctant to impose DT & I conditions on merging railroads because, in the Commission's view, these conditions eliminate many of the benefits which a merger would otherwise provide. Because consolidated railroads are presumably more efficient, they could charge lower rates on their single-line routes, thus providing more efficient service and more effective competition with other types of transportation. However, rate equalization prevents these fare reductions. See, e.g., Rulemaking, supra, at 123, CSX Corp.--Control--Chessie & Seaboard, C.L.I., 363 I.C.C. 518 (1980); Seaboard Coast Line R. Co.--Investigation of Control, 360 I.C.C. 582, 601 (1979).
 
 
 16
 In 1980, the Commission commenced rulemaking proceedings to examine the appropriate place for DT & I conditions in today's transportation environment. These proceedings culminated in the March 9, 1982 order of the Commission at issue in this proceeding in which the Commission declared, for the reasons discussed above, that DT & I conditions were anticompetitive, were no longer in the public interest, and would therefore not be imposed on any future railroad mergers. In addition, the Commission ordered that DT & I and similar conditions be removed from all existing mergers. It is this latter ruling which is the focus of petitioners' complaint.
 
 
 17
 In addition to making economic arguments against the conditions, the Commission's order also argued that continuation of DT & I conditions is in conflict with congressional policies aimed at encouraging greater regulatory flexibility and rate reductions. In particular, the Commission pointed to provisions of the Staggers Act of 1980 which allow reduced rates in certain circumstances and thus a partial circumvention of the rate equalization requirement of the DT & I conditions. See 49 U.S.C. Secs. 10705a, 10713 (1983). Finally, the Commission argued that DT & I conditions were no longer necessary because the Commission retained significant statutory authority to prevent consolidated carriers from closing gateways and shutting competing railroads out of access to markets. See 49 U.S.C. Sec. 10705(e) (1982).
 
 
 18
 The Commission attempted to cushion the impact of its retroactive ruling by giving beneficiary, affected carriers two months to file complaints giving reasons why the DT & I conditions should be retained in particular situations. However, in the hearings which resulted from these complaints, the burden would be on the complaining parties to show why the DT & I conditions should not be removed. All decisions regarding continuation of DT & I conditions would be final as of July 1, 1982.
 
 
 19
 The petitioners subsequently filed suit in this court to block implementation of the ICC order. On May 19, 1982, this court granted a stay of the Commission's revocation order pending the outcome of the litigation. After careful consideration of all arguments, we hold that enforcement of the revocation order shall be permanently enjoined.
 
 
 20
 We find much of the Commission's decision in this case well reasoned and persuasive. Nonetheless, the Commission's decision to remove DT & I conditions from all previously approved mergers is fatally flawed because of its total failure to consider, as required by Congress, the effect of its ruling on regional rail competition.[2] When the Commission approves a rail consolidation, it becomes exempt from the antitrust laws. 49 U.S.C. Sec. 11341. For this reason, the Commission has always been required to weigh the anticompetitive effects of any proposed merger when deciding whether the merger is in the public interest. See United States v. ICC, 396 U.S. 491, 504, 90 S.Ct. 708, 714, 24 L.Ed.2d 700 (1970). While this requirement was originally an implied one, it was officially made a part of the factors to be considered by the Commission when evaluating a merger proposal by the Staggers Act of 1980. "[T]he Commission shall consider ... (E) whether the proposed transaction would have an adverse effect on competition among rail carriers in the affected region." 49 U.S.C. Sec. 11344(b)(1) (1983).
 
 
 21
 We realize that the Commission is not considering whether to approve an individual merger but rather whether to modify a number of already approved mergers. Nonetheless, we deem it just as incumbent upon the Commission to consider the effect on rail competition when it is modifying existing mergers as when it is originally approving them. This is especially true here because the DT & I conditions were originally attached to these consolidations for the sole purpose of insulating other railroads from the mergers' harmful effects.
 
 
 22
 Unfortunately, the Commission has completely failed to do what the statute requires. Its rulemaking decision never mentions 49 U.S.C. Sec. 11344(b)(1)(E) in particular or the effect on rail competition in general. In its zeal to carry out one part of its congressional mandate--encouraging greater rate flexibility and improved competitiveness with other modes of transportation--the Commission has apparently lost sight of another part of its mandate--considering the effect of its proposals on competition within the railroad industry itself. Failure to consider all congressionally mandated factors is clearly grounds for setting aside agency action. See Argo Collier Truck Lines Corp. v. United States, 611 F.2d 149, 155 (6th Cir.1979). Therefore, we hold that the Commission's order revoking the DT & I conditions on all previously approved mergers is invalid because "not otherwise in accordance with law." 5 U.S.C. Sec. 706(2)(A).
 
 
 23
 Moreover, should the Commission decide to revamp its rulemaking order in light of this opinion, we also hold that the Commission must conduct individual hearings on each previously approved merger before it can find that revocation of DT & I conditions imposed on that merger is appropriate. We recognize, of course, that the Commission is not uniformly prohibited from employing rulemaking activity to affect rights previously granted in individual adjudicatory proceedings. See, e.g., American Airlines v. CAB, 359 F.2d 624, 628-29 (D.C.Cir.), cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966); Regular Common Carriers Conference v. United States, 307 F.Supp. 941 (D.D.C.1969) (three-judge panel). Nevertheless, the peculiar circumstances of this case require individual adjudication before the Commission can rationally conclude that revocation of DT & I conditions is in the public interest. This is true for two reasons. First, the effect of revocation on rail competition will vary greatly depending on the facts of each case. In some areas, the non-consolidated railroads will be vigorous enough to survive revocation of DT & I conditions relatively unscathed. In other areas, removal of the conditions may bring about the demise of competing railroads. Second, many railroads may have foregone the opportunity to request the kind of specifically tailored, traffic protective conditions that the Commission has decided not to revoke knowing that the more general DT & I conditions were going to be imposed. These railroads deserve an opportunity to argue their case before a Commission that has not already adopted a presumption that DT & I conditions are not in the public interest.
 
 
 24
 Accordingly, the decision of the ICC is reversed and remanded to the ICC for proceedings consistent with this court's opinion.
 
 
 
 [1]
 The standard conditions as actually imposed in the DT & I case are as follows:
 
 
 [1]
 That under applicants' control, [the merged carrier] shall maintain and keep open all routes and channels of trade via existing junctions and gateways, unless and until otherwise authorized by us
 
 
 [2]
 The present neutrality of handling traffic inbound and outbound by [the merged carrier] shall be continued so as to permit equal opportunity for service to and from all lines reaching the rails of those carriers without discrimination as to routing or movement of traffic and without discrimination in the arrangement of schedules or otherwise
 
 
 [3]
 The present traffic and operating relationships existing between [the merged carrier], on the one hand, and all lines connecting with their tracks, on the other, shall be continued insofar as such matters are within the control of the applicants
 
 
 [4]
 [The merged carrier] shall accept, handle, and deliver all cars inbound and outbound, loaded and empty, without discrimination in promptness or frequency of service as between cars destined to or received from competing carriers and irrespective of destination or route of movement
 
 
 [5]
 Applicants shall not do anything to restrain or curtail the right of industries located on [the merged carrier] to route traffic over any or all existing routes and gateways
 
 
 [6]
 Any party or any person having an interest in the subject matter may at any future time make application for such modification of the above conditions, or any of them, as may be required in the public interest, and jurisdiction should be retained to reopen the proceeding on our own motion for the same purpose
 Petitioners are concerned about the vagueness of the Commission's order because it does not specify exactly which conditions in the mergers are being revoked. The order speaks of revoking "standard DT & I conditions imposed in past consolidations and other similar conditions imposed prior to 1950." Elsewhere, the Commission states that "tailormade conditions are not affected by this rulemaking." Petitioners express uncertainty over whether particular conditions are "standard" and thus revoked or "tailormade" and thus preserved. We share petitioners' concern but need not decide this issue because of our holding in this case.
 
 
 [2]
 The Commission also failed to take into consideration the other four factors mentioned in 49 U.S.C. Sec. 11344(b)(1). Of these, the one of most consequence is "the interest of carrier employees affected by the proposed transaction." Any future Commission action in this area should also include discussion of these factors as well. We emphasize the failure to consider rail competition in the text because it is the most significant of the Commission's omissions and because a desire to preserve rail competition was the motivating force behind the original imposition of the DT & I conditions