**BALTIMORE GAS AND ELECTRIC COMPANY, Petitioner,**

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents, Association of American Railroads, Consolidated Rail Corporation, Chemical Manufacturers Association, National Industrial Transportation League, Patrick W. Simmons, the Southern Transportation League, Inc., Eastern Industrial Traffic League, Inc., Amherst Industries, Inc., Cheney Lime & Cement Company, Altra Railroad Company, Rail Enterprises, Inc., Pittsburgh and Lake Erie Railroad Company, Intervenors.

**CONSOLIDATED RAIL CORPORATION, Petitioner,**

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents, Chemical Manufacturers Association, Patrick W. Simmons, PPG Industries, Inc., Association of American Railroads, National Industrial Transportation League, Pittsburgh and Lake Erie Railroad Company, International Minerals and Chemicals Corp., Committee on Transportation & Distribution of the Society of the Plastics Industry, Inc., Transportation Committee of the Rubber Manufacturers Assoc., Baltimore Gas and Electric Co., Intervenors.

Nos. 85–1761, 85–1845.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 24, 1986.

Decided April 21, 1987.

As Amended April 21, 1987.

Harvey J. Reed, with whom David M. Perlman and David A. Brune, Baltimore, Md., for Baltimore Gas and Elec. Co. petitioner in No. 85–1761 and intervenor in No. 85–1845; Richard R. Wilson for Pittsburgh and Lake Erie RR., intervenor in No. 85–1761; John A. Vuono, Pittsburgh, Pa., for PPG Industries, Inc., intervenor in No. 85–1845; Susan J. Blum and Martin W. Bercovici, Washington, D.C., for Transp. Committee of the Rubber Manufacturers Ass'n, et al., intervenors in No. 85–1845; and William P. Jackson, Jr., Arlington, Va., for The Southern Transp. League, Inc., et al., intervenors in No. 85–1761 were on the joint brief.

Paul A. Cunningham, with whom Robert M. Jenkins, III, Marc D. Machlin, David A. Hirsh, Richard B. Herzog, Washington, D.C., and Constance L. Abrams, Philadelphia, Pa., were on the brief for Consolidated Rail Corp., petitioner in No. 85–1845 and intervenor in No. 85–1761.

Timm L. Abendroth, Atty., I.C.C., with whom Robert S. Burk, Gen. Counsel, Ellen D. Hanson, Associate Gen. Counsel, Louis Mackall, Atty., I.C.C., Catherine G. O'Sullivan and Donald S. Clark, Attys., Dept. of Justice, Washington, D.C., were on the

brief for respondents in Nos. 85–1761 and 85–1845. John P. Fonte and John J. Powers, III, Attys., Dept. of Justice, Washington, D.C., entered appearances for respondents.

Gordon P. MacDougall, Washington, D.C., for intervenor, Patrick W. Simmons in Nos. 85–1761 and 85–1845.

R. Eden Martin, with whom David M. Levy, Richard E. Young and J. Thomas Tidd, Washington, D.C., were on the brief for intervenor, Ass'n of American Railroads in Nos. 85–1761 and 85–1845.

John L. Oberdorfer and Claudia L. Deering for Chemical Mfrs. Ass'n, and John F. Donelan, Washington, D.C., for The Nat. Industrial Transp. League were on the joint brief for intervenors in Nos. 85–1761 and 85–1845. John M. Cleary, Washington, D.C., entered an appearance for intervenor, Nat. Industrial Transp. Scott N. Stone and David Zoll, Washington, D.C., entered appearances for intervenor, Chemical Mfrs. Ass'n.

Before MIKVA, RUTH BADER GINSBURG and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Petitioners Baltimore Gas and Electric Company ("BG & E") and Consolidated Rail Corporation ("Conrail") challenge Interstate Commerce Commission regulations governing the ICC's disposition of railroad "competitive access" proceedings, which were promulgated in response to recent legislation. *See* 49 C.F.R. §§ 1144.1–1144.6 (1986). BG & E mounts a two pronged attack: substantively, it argues the regulations are "inconsistent" with the agency's congressional mandate; procedurally, it contends the ICC's rulemaking was defective in various aspects. Conrail, on the other hand, supports the overall direction of the regulations and disputes only the

validity of a single provision relating to the suspension of through routes and joint rates. We hold the ICC followed proper procedures in its rulemaking and that the challenged portions of the regulations do not contravene congressional authority.

**I.**

■ "Competitive access" refers to inter-railroad cooperative arrangements under which railroads participate in "through routes" with other railroads, offer shippers "joint rates" on such routes, use other railroads' terminal trackage facilities, and "switch" cars in the service of other railroads to and from track sidings where shippers are located. A through route is an arrangement under which a shipment is transported to its ultimate destination by two or more railroads in succession. The rate charged for such a service is a joint rate if it is published as a single tariff, collected by the delivering railroad, and divided among all participants according to a "divisions" formula prescribed by the ICC or arrived at through negotiations between railroads.[1]

By the mid–1970's, the railroad industry had evolved into a system characterized by "open routing" and "rate equalization." Open routing refers to the practice whereby through routes were created on practically all possible combinations of railroad tracks between two points, while rate equalization means that all routes between the same two points—including single-line routes—were offered to shippers at the exact same rates, without regard to the actual cost of providing the service. Although railroads themselves contributed to this structure—by establishing joint rates in ICC-authorized rate-making cartels ("rate bureaus") immune from antitrust regulation—the crucial support for this regimen came from the ICC itself. The ICC presumably sought to preserve the widest possible network of through routes in order to protect disadvantageously located

---

1. A through route can still exist in the absence of a joint rate: shippers are then charged the sum of rates set independently by the participating railroads—rates established especially for use on through routes (a "combination of proportional rates"), or simply the standard local rates for travel over each railroad (a "combination of local rates").

shippers, and apparently viewed price competition on routes between the same two points as a form of improper "discrimination."

■ The Commission used three main regulatory devices to maintain open routing and rate equalization. First, the ICC has legal authority to require a railroad to participate in through routes and joint rates whenever "desirable in the public interest," 49 U.S.C. § 10705(a)(1) (1982) (previous version at 49 U.S.C. § 15(3) (1970)), and the corollary power to set aside proposed cancellations of through routes and joint rates that are not "consistent with the public interest." 49 U.S.C. § 10705(e) (1982) (previous version at 49 U.S.C. § 15(3) (1970)). These authorities were used to prescribe and maintain through routes and joint rates. Second, the ICC for many years imposed conditions on its approval of railroad mergers ("DT & I Conditions") that required a surviving railroad to maintain all existing routes, including through routes—even if the railroad could, as a result of the merger, provide the same service over a single line. Finally, the ICC enforced the "commercial closing doctrine" —whereby any attempt by a railroad to lower the rate on one route "closed" (i.e., put out of business) all higher-priced through routes between the same points.[2] Such a closing was held to be unlawful if it violated DT & I Conditions requiring the "closed" route to be kept open. Even if no DT & I Conditions were applicable, absent the consent of all affected railroads, the closing triggered the requirement set out in 49 U.S.C. § 10705(e) that a railroad show cancellation of a "closed" route is consistent with the public interest—which the ICC seldom found. *See Fibreboard or Pulpboard, Montana to California,* 357 I.C.C. 211, 219 (1977); *Western Railroads— Agreement,* 364 I.C.C. 635, 645 (1981).

Much of the railroad industry and many shippers became greatly dissatisfied with open routing and rate equalization. Rate equalization necessarily forced certain shippers to pay rates that were higher than might have prevailed in a competitive environment, in order to "cross subsidize" artificially low rates charged other shippers. *See* S.Rep. No. 499, 94th Cong., 1st Sess. 10–11 (1975). By the same token, railroads found it very difficult to adjust prices in accordance with costs. Railroads with more efficient routing were typically prevented from offering lower rates, which retarded the industry's ability to compete with other modes of transportation such as trucks, barges and pipelines. *See* S.Rep. No. 499 at 10–11. The same regulatory barrier often prevented railroads from raising rates even when their share of joint rates did not cover variable costs and provide a fair rate of return. This of course reduced their ability to attract capital needed to maintain and revitalize existing facilities. *See* H.R. Conf.Rep. No. 1430, 96th Cong., 2d Sess. 79 (1980); S.Rep. No. 470, 96th Cong., 1st Sess. 3–6 (1979), U.S. Code Cong. & Admin.News 1980, p. 3978.

Of course, not everyone was unhappy with open routing and rate equalization. Some shippers evidently perceived an advantage in the simplicity of unified rates, the wide choice of routes available, and the low rates on some of those routes. And certain railroads, generally the smaller ones, may have benefitted (to the extent they received sufficient revenue from through routes to cover their costs of participation) since the proliferation of through routes gave them access to a wider market of shipping customers.

Still, facing what amounted to an overall financial crisis in the railroad industry, *see* H.R.Rep. No. 1035, 96th Cong., 2d Sess. 34–37 (1980); S.Rep. No. 499 at 2–11, Congress enacted two major pieces of legisla-

---

**2.** *See Kansas City Southern Ry. Co. v. United States,* 288 F.Supp. 742, 747–48 (W.D.Mo.1968) (ICC "has found a 'closing' whenever one line has made another's route commercially unattractive"); *Traffic Protective Conditions,* 366 I.C.C. 112, 113 (1982), *rev'd on other grounds sub nom. Detroit, Toledo and Ironton R.R. Co.*

*v. United States,* 725 F.2d 47 (6th Cir.1984) ("We feared that if a single-line rate were lowered without securing the concurrence of all connecting carriers in lowering the corresponding joint-line rates, the 'commercial closing' of certain routes or gateways would occur and competition would be reduced").

tion of a generally deregulatory thrust. In 1976, Congress passed the Railroad Revitalization and Regulatory Reform Act ("4R Act"), which stated that congressional policy was to, *inter alia,*

> (1) balance the needs of carriers, shippers, and the public;
> (2) foster competition among all carriers by railroad and other modes of transportation, to promote more adequate and efficient transportation services, and to increase the attractiveness of investing in railroads ... [and]
> (3) permit railroads greater freedom to raise or lower rates for rail services in competitive markets.

Pub.L. No. 94–210, § 101(b), 90 Stat. 31, 33 (1976). Of the many additional provisions in the 4R Act, two are directly relevant to this case. Section 203(a) of the 4R Act cut back on ICC discretion to deny through route and joint rate cancellations, *see supra* p. 111, by specifying the factors germane to the pre-existing public interest test:

> (1) ... the distance traveled and the average transportation time and expense required using (A) the through route, and (B) alternative routes, between the places served by the through route; (2)

... any reduction in energy consumption that may result from the cancellation; and (3) ... the overall impact of cancellation on the shippers and carriers that are affected by it.

49 U.S.C. § 10705(e) (1982). Congress, it would seem, implicitly modified prior regulatory barriers—such as the commercial closing doctrine—that the ICC had utilized to maintain open routing and rate equalization.[3] In effect, Congress required the ICC to balance the interests of shippers affected by a cancellation against the interests of the railroad seeking cancellation, making cancellations easier to obtain. As a corollary, section 202(e)(2) of the 4R Act limited the ICC's authority to preliminarily suspend a proposed cancellation to situations where "(i) without suspension the proposed rate change will cause substantial injury to the complainant ...; and (ii) it is likely that such complainant will prevail on the merits." 90 Stat. 31, 38 (1976).

Four years later, Congress enacted the Staggers Rail Act, Pub.L. No. 96–448, 94 Stat. 1895 (1980) ("Staggers Act"), which set forth as the nation's rail transportation policy fifteen different and not entirely consistent goals.[4] In addition to the articu-

**3.** Subsequent to passage of the 4R Act, the Commission issued a series of decisions explicitly narrowing the commercial closing doctrine. *See Western Railroads—Agreement,* 364 I.C.C. 635, 645 (1981), *citing* No. 36746 (Sub-No. 66), *Hog Hair, Versailles, Ohio to Etowah, Tenn.* (not printed), decided March 20, 1980. Presently, the lowering of a rate on one route will "commercially close" a through route between the same points, and thereby trigger the public interest test of 49 U.S.C. § 10705(e), only if a protestant can show that the through route "has been in use and now is not and cannot be made competitive." *Traffic Protective Conditions,* 366 I.C.C. 112, 128 (1982), *rev'd on other grounds sub nom. Detroit, Toledo and Ironton R.R. Co. v. United States,* 725 F.2d 47 (6th Cir.1984).

**4.** The goals are as follows:

(1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;

(2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required;

(3) to promote a safe and efficient rail transportation system by allowing rail carriers to

earn adequate revenues, as determined by the [ICC];

(4) to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and the national defense;

(5) to foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes;

(6) to maintain reasonable rates where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital;

(7) to reduce regulatory barriers to entry into and exit from the industry;

(8) to operate transportation facilities and equipment without detriment to the public health and safety;

(9) to cooperate with the States on transportation matters to assure that intrastate regulatory jurisdiction is exercised in accordance with the standards established in this subtitle;

(10) to encourage honest and efficient management of railroads and, in particular, the elimination of noncompensatory rates for rail transportation;

lation of national rail transportation policy, the Act contained two other provisions bearing on our case. Section 207(c) placed even further limitations upon the ICC's power to preliminarily suspend cancellations of through routes and joint rates, by permitting suspension only when a party challenging the lawfulness of the cancellation is "substantially likely" to succeed on the merits, 49 U.S.C. § 10707(c)(1)(A) (1982), and the protesting party cannot be protected by subsequent refunds. 49 U.S.C. § 10707(c)(1)(C) (1982). Section 223, in contrast, *increased* the ICC's regulatory power—by authorizing the agency to require railroads to enter into agreements to "switch" other railroads' cars to and from shippers located along each other's lines "where it finds such agreements to be practicable and in the public interest, or where such agreements are necessary to provide competitive rail service." 49 U.S.C. § 11103(c)(1) (1982). The Commission's authority to order such switching arrangements had previously been unclear. *See* H.R.Rep. No. 1035 at 67.

The ICC decided to hold a public conference in 1984 for the purpose of "gather[ing] and analyz[ing], with the assistance of shippers and carriers, information relating to the effect of the reforms stemming from recent rail legislation...." Ex Parte No. 456, *The Staggers Rail Act of 1980— Conference of Interested Parties* (served Sep. 14, 1984). The conference addressed many issues facing the railroad industry, including but not limited to questions of competitive access—i.e., through routes, joint rates, switching arrangements and

(11) to require rail carriers, to the maximum extent practicable, to rely on individual rate increases, and to limit the use of increases of general applicability;

(12) to encourage fair wages and safe and suitable working conditions in the railroad industry;

(13) to prohibit predatory pricing and practices, to avoid undue concentrations of market power and to prohibit unlawful discrimination;

(14) to ensure the availability of accurate cost information in regulatory proceedings, while minimizing the burden on rail carriers of developing and maintaining the capability of providing such information; and

(15) to encourage and promote energy conservation.

terminal trackage rights. Under auspices of the conference, two sets of proposed rules to govern ICC handling of competitive access issues were presented. One proposal was jointly sponsored by the American Association of Railroads, the National Transportation League and the Chemical Manufacturers Association (the "AAR proposal"). The second proposal was fashioned by a group of small regional railroads called Railroads Against Monopoly (the "RAM proposal"). Each group petitioned the ICC to adopt its respective proposal. In response, the ICC issued a notice of proposed rulemaking, declaring its intention to "adopt rules to govern its handling of various competitive access issues" and inviting comments on the AAR and RAM proposals as well as suggestions for their modification. Seventy-eight opening statements and 41 reply statements were submitted by various parties; the ICC held oral argument, and permitted supplemental comments to be filed.

In its final decision the ICC adopted regulations substantially similar to the AAR proposal but incorporating portions of the RAM proposal. Ex Parte No. 445 (Sub-No. 1), *Intramodal Rail Competition* (served Oct. 31, 1985). The regulations set out the standards the ICC will use in determining whether to prescribe through routes and joint rates, and establish switching arrangements: the ICC will step in only where necessary to remedy or prevent acts that are "contrary to the competition policies of 49 U.S.C. [§] 10101a or [are] otherwise anticompetitive." 49 C.F.R. § 1144.-5(a)(1)(i) (1986).[5] Similarly, the ICC will set

Section 101(a), 94 Stat. 1895, 1897–98, 49 U.S.C. § 10101a (1982).

5. The regulations also indicate that through routes and joint rates will not be prescribed (nor switching arrangements established, nor cancellations suspended) unless a protesting shipper or railroad has used or would use the route or rate for a significant portion of its shipping needs or traffic. 49 C.F.R. § 1144.-3(c)(2) and 1144.5(a)(2) (1986). Intervenor Simmons, representing the United Transportation Union, argued that these provisions constituted an arbitrary and capricious standing requirement that prevented a trade union from challenging through route or joint rate cancellations. The ICC stated in its brief that Simmons'

aside proposed cancellations of through routes and joint rates only where a cancellation, or the rate that would remain after the cancellation, is "anticompetitive." 49 C.F.R. § 1144.4(a) (1986). In making these determinations, the ICC will consider "all relevant factors." [6] 49 C.F.R. §§ 1144.4(b) and 1144.5(a)(1) (1986). Finally, the regulations state the ICC will initially suspend any cancellation that "eliminate[s] effective *railroad* competition for the affected traffic between the origin and destination"—without regard to whether intermodal or other forms of competition might still exist. 49 C.F.R. § 1144.4(c)(1) (1986) (emphasis added).[7] Both BG & E and Conrail now seek review before this court of various aspects of the regulations, pursuant to 28 U.S.C. §§ 2321(a) and 2342(5) (1982).

## II.

BG & E challenges the Commission's decision to prescribe through routes and joint rates, and establish switching arrangements, *only* to remedy or prevent "anticompetitive" acts, and to set aside *only* "anticompetitive" through route and joint rate cancellations, as inconsistent with the rail transportation policy of 49 U.S.C. § 10101a (1982). *See supra* note 4. BG &

E argues that Congress intended the ICC to take more drastic action: "to negate the monopoly power railroads hold over sunk facilities such as trackage and switching," and thereby "preserv[e] and promot[e] rail-to-rail competition whenever possible." The regulations, BG & E states, are "precisely the wrong approach." BG & E would have us direct the ICC to return essentially to its old regulatory regime, by prescribing through routes on all possible combinations of tracks between all points. This reversion to open routing, however, would not be accompanied by the old rate equalization. Instead, BG & E would have the ICC limit rates to the "fully allocated cost of providing the service"—a figure that would apparently include the variable costs incurred as a result of use of the facilities, a share of overall maintenance and operating expenses, and a component for return on investment.

In support of this alternative, BG & E relies primarily on the first of the fifteen goals listed by Congress: "to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail." 49 U.S.C. § 10101a(1) (1982). Competition would most efficiently influence rates, BG & E argues, if all railroads could, by way

inference—that the regulations would be interpreted so as to preclude labor interests from initiating protests—was "entirely speculative," i.e., not ripe for review. Commission counsel stated at oral argument, however, that the regulations were not intended, and would not be interpreted, to limit any rights a labor union had to protest cancellations before the ICC. Since these regulations do not, at all, affect whether, and under what conditions, a labor union has such a right, Simmons' union is not a "party aggrieved" by the ICC's action within the meaning of 28 U.S.C. § 2344.

**6.** The Commission will not, however, consider "product competition." 49 C.F.R. §§ 1144.-4(c)(1) and 1144.5(b)(1) (1986). In this context, product competition exists "where a shipper or receiver can use a substitute for the product [transported over the through route] and the railroad [participating in the through route] competes with the carrier transporting the alternative product." Ex Parte 445 (Sub-No. 1) at 7.

**7.** There are four essential differences between the regulations and the RAM proposal. First, the RAM proposal would prohibit all through

route or joint rate cancellations that "reduce effective railroad competition" between any two points. In addition, under the RAM proposal, a railroad could not cancel a through route if the railroad's ratio of revenue to variable cost on the route marked for cancellation exceeds the same ratio on any other routes the railroad serves between the same two points. This bright-line standard would prevent a railroad that participates in a through route—and also offers a less efficient, and relatively less profitable, single-line route between the same points—from closing down the through route and thereby driving smaller participating railroads out of the market. But this ratio test could also on occasion prevent railroads from even closing down through routes that are *less* efficient than competing single-line routes. Third, the RAM proposal would limit charges for reciprocal switching services to the "fully allocated cost of providing such service." Finally, the RAM proposal includes a provision on terminal trackage rights. The ICC chose not to address terminal trackage rights in the regulations, deciding to consider requests for terminal trackage rights on a case by case basis. *See* Ex Parte 445 (Sub-No. 1) at 14.

of through routes, benefit from all of each other's tracks and facilities. If the ICC does not adopt BG & E's regulatory concept, the ICC will have to rely on other regulation in certain circumstances to set maximum rates, and this, BG & E argues, is "inconsistent" with the Staggers Act purposes.[8]

BG & E's position, as we understand it, is that recent rail legislation requires the ICC to regulate the railroad industry along the lines of the telecommunications industry. Indeed, BG & E explicitly made this argument before the ICC. In the telecommunications industry companies that own long-distance communications facilities can provide long-distance service to customers only if the companies have access to local telephone lines. Under the AT & T antitrust suit settlement, local Bell telephone companies are required to permit all long distance telephone companies equal access to the lines and switching facilities necessary to reach local customers. *See United States v. American Tel. & Tel. Co.,* 552 F.Supp. 131, 196 (1982), *aff'd,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). "That provision was designed to make it impossible for a 'bottleneck' monopoly to prevent competitors from providing service by refusing to provide the necessary connections." *United States v. Western Electric Co.,* 583 F.Supp. 1257, 1259 (1984). Railroads desirous of offering services to shippers situated along other railroads' tracks similarly must first in some manner gain access to those shippers. Therefore, BG & E urges us to direct the ICC to "use the fullest extent of its authority to grant trackage rights whenever practicable."

■ The AT & T settlement was approved by the court because it was found to be "in the public interest," 15 U.S.C. § 16(e), as defined "in accordance with the antitrust laws." 552 F.Supp. at 149. BG & E, on the other hand, bases its argument—as it must—not on antitrust law but rather on the Staggers Act. BG & E's position might well reflect sound econom-

ics, and might—we do not decide—be a reasonable interpretation of the statute. Certainly, however, it is not the *only* reasonable interpretation, because as we have noted, the statutory directives under which the ICC operates do not all point in the same direction. We see not the slightest indication that Congress intended to mandate a radical restructuring of the railroad regulatory scheme so as to parallel telecommunications regulation. Our task thus is only to determine whether the ICC has arrived at a reasonable accommodation of the conflicting policies set out in its governing statute. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 845, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984). We conclude that the regulations do that. They make it easier for railroads to avoid participation in unremunerative and inefficient through routes, thereby assisting railroads' efforts to earn adequate revenues. *See* 49 U.S.C. § 10101a(3) (1982). But, as the ICC explicitly noted in its decision, the needs of the railroads are not the sole consideration. Ex Parte 445 (Sub-No. 1) at 7. The regulations take into account shippers' interests in reasonable rates, *see* 49 U.S.C. §§ 10101a(1) and (6) (1982), by, for example, requiring the ICC to set aside through route cancellations that are "anticompetitive." They also reflect the Staggers Act's strong emphasis on preserving and enhancing competition, *see* 49 U.S.C. §§ 10101a(1), (4) and (5) (1982), and at the same time restrict the circumstances under which the ICC will exercise its power to require through routes and joint rates, thereby limiting federal regulatory control over the industry, *see* 49 U.S.C. § 10101a(2) (1982).

■ Alternatively, BG & E argues that the ICC improperly failed to respond to BG & E's comments urging complete reshaping of railroad industry regulation, failed to provide a reasoned explanation for why it rejected the RAM proposal, and did not address other "meaningful comments."

---

8. BG & E also points to the seventh goal set out in the Staggers Act—"to reduce regulatory barriers to entry into and exit from the industry." 49 U.S.C. § 10101a(7) (1982). BG & E's reliance

appears misplaced, however, because this provision directs the ICC to reduce *regulatory* barriers to entry, while BG & E asks for regulation in order to eliminate *natural* barriers to entry.

The ICC counters that it was not obligated to respond to BG & E's broadside attack when the Commission had previously made clear in a series of adjudications that it had no intention of proceeding along BG & E's radically different path. We agree with the Commission. "The failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not 'based on a consideration of the relevant factors.'" *Thompson v. Clark,* 741 F.2d 401, 409 (D.C.Cir.1984) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). Under the "arbitrary and capricious" standard of review, an agency is thus required to respond to significant comments that cast doubt on the reasonableness of the rule the agency adopts. *See Home Box Office, Inc. v. FCC,* 567 F.2d 9, 35 n. 58 (D.C.Cir.1977). Challenges to the internal integrity or reasonableness of the regulatory structure proposed might well cast such doubt, as would challenges to the lawfulness of the proposed rule. But an agency need not comment on policy-based challenges to the basic premise of the proposed rule where the agency has already chosen a particular reconciliation of conflicting congressional directives and has previously explained its reasoning. Under those circumstances, the agency's silence does not suggest to us a failure to consider relevant factors.

Such is the case here. Prior to instituting the rulemaking in this case, the Commission had rejected the premise upon which BG & E's comments were based: that Congress's emphasis on enhancing competition requires the ICC to preserve the maximum number of rail routes possible. In 1981, the Commission indicated that it was not concerned by the loss of inefficient through routes: "To the extent that our [decision] will result in the loss of some routes and a consequent reduction in the number of routing options available to shippers, that effect is outweighed by the desirability of more efficient routing." *Western Railroads—Agreement,* 364 I.C.C. 635, 649 (1981). Perhaps most importantly, the ICC concluded in 1983 that "activities limiting joint rate application and use of existing market power" are not necessarily anticompetitive, since

> [t]o the extent that recent changes to the joint rate structure reflect inherent or developed advantages one carrier may have over another, such as a shorter or more efficient single line route, they are changes that the Staggers Act encourages, as they ultimately produce a more efficient and competitive industry.

Ex Parte No. 445, *Standards for Intramodal Rail Competition,* p. 10–11 (served July 7, 1983). The Commission thus announced that it would "intervene only when there are inadequate economic restraints on market power." *Id.* at 13. Based on this clearly articulated line of Commission decisions, we agree that the comments BG & E submitted in the instant rulemaking did not require a response by the agency.[9]

Petitioner, it will be recalled, also argues that the ICC inadequately responded to RAM's proposal, and to comments submitted by other parties. Paradoxically, RAM has not appealed the Commission's decision.[10] But in any event, we do not

---

9. BG & E also argues that the ICC's failure to explain an "apparent contradiction" between the challenged regulations and its decision in a prior proceeding, Ex Parte No. 347 (Sub-No. 1), *Coal Rate Guidelines, Nationwide,* 1 I.C.C.2d 520 (1985), *aff'd Consolidated Rail Corp. v. United States,* 812 F.2d 1444 (3rd Cir.1987), renders the rulemaking invalid. In Ex Parte No. 347, the ICC based its determination of maximum reasonable rates for captive shipments of coal on a model: the rate that a shipper would be charged in isolation by an efficient hypothetical competitor to the railroad in the absence of any barriers to entry. In the rulemaking BG & E challenges, the ICC declined an invitation to *in fact* remove all barriers to entry in the railroad industry.

Since no contradiction is apparent to us, we reject this argument.

10. BG & E's interests appear to differ somewhat from those of the small regional railroads that make up RAM. RAM's members must participate in through routes in order to reach many potential customers. From comments submitted to the ICC by RAM and the Soo Line Railroad Company, it appears that small railroads are increasingly concerned that they may be cut off from existing customers by through route cancellations. Although there is a substantial dispute over whether a railroad able to offer a single-line route between two points would have any incentive to maintain partic-

find the ICC's explanation defective. In an informal rulemaking proceeding such as this, the agency, "[a]fter consideration of the relevant matter presented," need only "incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c) (1982). "[S]uch a statement should indicate the major issues of policy that were raised in the proceedings and explain why the agency decided to respond to these issues as it did, particularly in light of the statutory objectives that the rule must serve." *Independent U.S. Tanker Owners Comm. v. Dole,* 809 F.2d 847, 852 (D.C.Cir.1987). The Commission's explanation meets that standard. The ICC interpreted RAM's proposal as blocking any cancellations that would have eliminated even one railroad as a competitor for shipments between two points, and explained that "a mere reduction in the number of carriers in a market does not necessarily imply a reduction in competition." Ex Parte 445 (Sub-No. 1) at 11. The ICC rejected RAM's revenue to variable cost test for lawfulness of cancellations, *see supra* note 7, because the Commission sought to make an "informed decision as to the relative efficiency and competitiveness of the routes under comparison," and, in the Commission's view, that ratio did not "fairly measure the costs of serving the traffic or accurately reflect the profitability of the service to the carrier." *Id.* at 12. Finally, with regard to RAM's suggestion for pricing of switching services, the Commission stated that it had "already rejected the use of a fully-allocated cost standard for pricing railroad service as arbitrary and eco-

nomically unsound," and decided to "leave for determination in each individual case what would be a fair and appropriate level of compensation ..." *Id.* at 13.[11]

■ BG & E's last contention is that the ICC unlawfully delegated to private parties—the sponsors of the AAR proposal—its authority to create rules, citing *National Ass'n of Regulatory Util. Comm'rs v. FCC,* 737 F.2d 1095, 1143–44 (D.C.Cir. 1984). Ordinarily, there is nothing objectionable about parties jointly submitting a proposed rule to an agency, and we do not understand BG & E to suggest impropriety here. That the ICC "attempted to preserve to the maximum extent possible the product of negotiation and compromise among the major carrier and shipper interests," Ex Parte 445 (Sub-No. 1) at 2, and that the adopted regulations differ little from the private parties' proposal, does not itself establish that the ICC, as BG & E claims, elevated the effectuation of the negotiated rules over its duty to protect the public interest. The Commission recognized that its "authority under the Interstate Commerce Act cannot be delegated; [its] first obligation is to implement and administer [the Act's] provisions in a manner consistent with the broader public interest." Ex Parte 445 (Sub-No. 1) at 2. We see no indication that the Commission was insincere. In any event, the Commission did not completely accept the AAR proposal. Rather, it grafted onto the AAR proposal several provisions taken from the RAM proposal. The ICC incorporated RAM's

---

ipation in a through route between the same points, "In general," the ICC believes, "a railroad acting in an economically rational manner would be expected to favor more efficient, joint-line routes over less efficient single-line routes." *Traffic Protective Conditions,* 366 I.C.C. at 126. *But see Chesapeake and Ohio Ry. Co. v. United States,* 704 F.2d 373, 377 (7th Cir.1983) ("regulatory distortions ... might make the closing of efficient through routes profitable conduct"). BG & E, on the other hand, is a major purchaser of coal, and would like to reduce the cost of shipping that coal. To the extent that an increase in the number of railroads competing to ship coal from a particular location results in lower costs to the shipper, BG & E's interests and those of RAM converge. BG & E's argument on behalf of universal through routes is,

therefore, not necessarily inconsistent with the RAM proposal—since each seeks to permit greater, not less, access by railroads to facilities owned by other railroads.

11. BG & E also points to the absence of any evidence in the record that the ICC considered the testimony of Dr. William B. Tye on behalf of RAM, and comments filed by the Soo Line Railroad Company. Both of these comments were in complete support of the RAM proposal. Because we have found the Commission's rejection of the RAM proposal was properly explained, we hold that there is no need for the Commission to explain why it chose not to heed these comments.

suggestion that a railroad proposing cancellation of a through route or joint rate supply opposing parties with "pertinent mileage and cost data." 49 C.F.R. § 1144.-1(b)(2) (1986). In addition, the suspension regulations include two rebuttable presumptions drawn from the RAM proposal. 49 C.F.R. § 1144.3(c)(1)(i) and (ii) (1986). The record shows that the ICC did in fact "take[ ] due note and careful consideration of the views of all interested parties" to the extent their comments fell within the scope of the rulemaking, *National Ass'n*, 737 F.2d at 1144, and therefore there was no unlawful delegation.

### III.

Conrail's sole challenge to the rules [12] is focused on the difference between the standard for preliminarily suspending cancellations of through routes and joint rates and that which the ICC will apply to determine the lawfulness of a cancellation. As noted above, the ICC may prohibit only cancellations that are not "consistent with the public interest," 49 U.S.C. § 10705(e) (1982), and the Commission may take the preliminary step of suspending a cancellation only if, *inter alia*, "it is substantially likely that the protestant will prevail on the merits." 49 U.S.C. § 10707(c)(1)(A) (1982). The ICC will ultimately find that a cancellation is not in the public interest if it is "anticompetitive"—"tak[ing] into account all relevant factors" except product competition. 49 C.F.R. § 1144.5(a) (1986). Geographic competition is a relevant factor, according to the regulations, if a cancelling carrier proves its existence by clear and convincing evidence. 49 C.F.R. § 1144.5(b)(2) (1986).[13] Although the regulations do not make this clear, the ICC apparently also treats intermodal competition—e.g., from trucks or barges—as relevant to determining whether a cancellation is anticompetitive. *See* Ex Parte 445 (Sub-No. 1) at 5. Conrail anticipates that cancellations will be found lawful by the Commission if, after a cancellation, intermodal or other forms of competition remain. When determining whether to initially suspend a cancellation, however, the ICC will consider only whether the cancellation "would eliminate effective railroad competition." 49 C.F.R. § 1144.3(c)(1) (1986). ICC counsel has explained that this excludes consideration of intermodal and geographic competition at the suspension stage: "railroad competition" means "competition from a railroad source," and its effectiveness will be measured without regard to other sources of competition.

Conrail argues that the Commission *must* consider the exact same criteria at the suspension stage as it considers on the merits. We disagree. The statute only requires that it be "substantially likely" that the result on the merits will be the same. The ICC reasonably believes that the existence of rail-to-rail competition is a normally accurate proxy for determining whether a cancellation is anticompetitive. Ex Parte 445 (Sub-No. 1) at 5. Moreover, it is not yet apparent exactly how the ICC will determine whether a cancellation is "anticompetitive" on the merits—i.e., what weight will be placed on the various factors. The Commission chose the intramodal test at the suspension stage because, *inter alia*, competition from railroads is the "easiest form of competition to analyze" and the Commission has only limited time to act on suspension requests. Ex Parte 445 (Sub-No. 1) at 5. The ICC has thus interpreted 49 U.S.C. § 10707(c)(1)(A) as permitting consideration at the suspen-

---

12. One section of the regulations requires that railroads proposing to cancel through routes or joint rates explain and justify the cancellation to any affected party, and provide "pertinent mileage and cost data." 49 C.F.R. § 1144.1 (1986). Conrail argues that the data requirements are arbitrary and capricious because they could be interpreted in an overly burdensome manner. This is purely speculative, however, and we agree with all parties—including Conrail—that since the concern might actually never arise the issue is not ripe for judicial review. *See South*

*Carolina Elec. & Gas Co. v. ICC,* 734 F.2d 1541, 1544–45 (D.C.Cir.1984).

13. "Geographic competition is present when a shipper-consignor may direct his product to a different destination, or a shipper-consignee may secure the same product from a different origin." *Atchison, Topeka & Santa Fe Ry. Co. v. ICC,* 580 F.2d 623, 633 n. 22 (1978). Apparently the ICC will adhere to this definition. *See* Ex Parte 445 (Sub-No. 1) at 7.

sion stage of fewer than all the factors that will ultimately be considered on the merits. The intent of Congress is less than clear on this issue,[14] and we cannot say the ICC's interpretation is unreasonable. *See Chevron,* 467 U.S. at 842–45, 104 S.Ct. at 2781–83.

The petitions are therefore denied.

*It is so ordered.*

---

**14.** Conrail points to language in the House Report on the Staggers Act which states, "The Committee intends ... that suspension would occur only in the most extraordinary cases." H.R.Rep. No. 1035, 96th Cong., 2d Sess. 57 (1980). But this characterization from the legislative history is explainable in light of 49 U.S.C. § 10707(c)(1)(C)—which precludes suspension if the protestant has an adequate refund remedy under subsection (d) even if a cancellation is substantially likely to be set aside on the merits.

Subsection (d) creates an accounting remedy that requires railroads to refund to shippers that portion of increased rates paid by the shippers but later found to be unreasonable. The Commission determined that subsection (d) "cannot offer adequate protection in the cancellation context because the traffic, if it continues to move by rail will generally move over the alternative route." Ex Parte 445 (Sub-No. 1) at 4 n. 2. Conrail has not challenged this position.